# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JESSICA A. SAFRONSKY,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | **NO. 16-4002** |
| **NANCY A. BERRYHILL,** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                                                                              **January 7, 2019**

## MEMORANDUM

Currently before me are Plaintiff Jessica A. Safronsky's Objections to the Report and Recommendation of United States Magistrate Judge David R. Strawbridge. Upon review of the entire record and the comprehensive Opinion written by Judge Strawbridge, I adopt the Report and Recommendation and affirm the Commissioner's finding on disability. However, given the difficult and sensitive issues raised by the record and identified by Plaintiff in her Objections, I write in more detail to explain why I am adopting Judge Strawbridge's Report.

## I. BACKGROUND

In September 2008, Plaintiff first applied for Disability Insurance Benefits and Supplemental Security Income, under Titles II and XVI respectively of the Social Security Act, 42 U.S.C. § 401, et seq. Plaintiff alleged disability due to a learning disorder. Her claim was denied and Plaintiff did not pursue an appeal. She reapplied in January 2010, again alleging disability resulting from a learning disorder and slow motor skills. This claim was also denied.

Plaintiff filed a new application on April 19, 2011, asserting a disability onset date of October 25, 2009. The state agency denied her application in August 2011, and Plaintiff requested an administrative hearing. Following the hearing, the ALJ issued a decision, dated November 16, 2012, finding Plaintiff not disabled. Plaintiff appealed to this Court. The Honorable William H. Yohn, Jr. granted the Commissioner's motion to remand and ordered the ALJ to engage a medical expert to assist in determining whether Plaintiff satisfied two particular criteria of Listing 12.05.

On December 8, 2015, the same ALJ held a second administrative hearing where Plaintiff, a vocational expert, and a medical expert testified. The ALJ then issued a new decision on March 30, 2016, finding Plaintiff not disabled because she did not meet or equal any of the Listings of Impairments in the Social Security regulations and was capable of performing jobs that existed in significant numbers in the national economy.

Plaintiff filed the present litigation on July 25, 2016, challenging the ALJ's decision. United States Magistrate Judge David R. Strawbridge issued a Report and Recommendation ("R&R") finding that the ALJ's decision was supported by substantial evidence. On June 7, 2018, Plaintiff filed objections to that R&R.[1]

---

[1] Where a United States Magistrate Judge has issued a report and recommendation in a social security case and a party makes a timely and specific objection to that report and recommendation, the district court is obliged to engage in de novo review of only those issues raised on objection. 28 U.S.C. § 636(b)(1); see also Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989). For those sections of the report and recommendation to which no objection is made, the court should, as a matter of good practice, "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b), advisory committee notes. The court may "accept, reject, or modify, in whole or in part, the findings and recommendations" contained in the report. 28 U.S.C. § 636(b)(1). In the exercise of sound judicial discretion, the court may also rely on the Magistrate Judge's proposed findings and recommendations. See United v. Raddatz, 447 U.S. 667, 676 (1980).

## II. STANDARD OF REVIEW

As discussed by Judge Strawbridge, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000). "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 564–65 (1988)). When making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. Id. at 1190–91; see also Gilmore v. Barnhart, 356 F. Supp. 2d 509, 511 (E.D. Pa. 2005) (holding that the court's scope of review is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact") (quoting Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001)). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

## III. PLAINTIFF'S OBJECTIONS

Plaintiff raises two general objections to the R&R. First, she contends that Judge Strawbridge erred in affirming the ALJ's determination that Plaintiff's intellectual disability did

not meet or equal Listing 12.05. Second, she claims that the ALJ erred in review of various examining and non-examining doctors.

### A. Listings Analysis

Plaintiff's first objection concerns the ALJ's review at step three of the sequential analysis. At this step, the ALJ must determine whether the claimant's impairment matches, or is equivalent to one of the listed impairments. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). The listings describe impairments that prevent an adult, regardless of age, education or work experience, from performing "any gainful activity." 20 C.F.R. §§ 404.1525(a); 1416.925(a); Knepp v. Apfel, 204 F.3d 78, 85 (3d Cir. 2000). "If the impairment is equivalent to a listed impairment, then [the claimant] is per se disabled and no further analysis is necessary." Burnett, 220 F.3d at 119. While the burden is on the claimant to present medical findings to show that his or her impairment meets or equals a listing, the ALJ should identify the closest applicable impairment, fully develop the record, and explain whether and why the claimant's impairments are or are not equivalent in severity to one of the listed impairments. Id. at 120 n.2.

At issue in this case is Listing 12.05 of the Social Security regulations, which deals with intellectual disorders. The introductory paragraph of 12.05 explains that such disorders are "characterized by significantly subaverage general intellectual functioning, significant deficits in current adaptive functioning, and manifestation of the disorder before age 22." Listing 12.05, Mental Retardation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (effective Mar. 24, 2011 to June 6, 2011). The Listing goes on to state that:

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and

4

inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B. A valid verbal, performance, or full scale IQ of 59 or less;

Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Id. "As the disjunctive language of the Listing indicates, the required level of severity for this disorder is met when the requirements of both the introductory paragraph and paragraph A, B, C *or* D of the Listing are satisfied." Simon v. Berryhill, No. 16-1533, 2017 WL 4842416, at *2 (W.D. Pa. Oct. 26, 2017). An impairment that meets only some of the criteria, "no matter how severely, does not qualify" for a per se disability determination. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

To satisfy part C—which is the specific subpart at issue here—a plaintiff must have "1) significantly subaverage intellectual functioning with deficits in adaptive behavior initially manifested during developmental period (i.e., before age 22); 2) a valid verbal, performance, or full scale IQ of 60 through 70; and 3) a physical or other mental impairment imposing an additional and significant work-related limitation or function." Simon, 2017 WL 4842416, at *2 (emphasis

in original) (citing 20 C.F.R. pt. 404, subpt. P., app. 1 § 12.05C; Williams v. Sullivan, 970 F.2d 1178, 1184 (3d Cir. 1992)); see also Illig v. Comm'r Soc. Sec., 570 F. App'x 262, 265 (3d Cir. 2014).

Here, the ALJ reviewed the criteria of Listing 12.05C and concluded that Plaintiff did not meet or equal that Listing. Focusing on the first element of 12.05C in particular, the ALJ remarked that Plaintiff did not show deficits in adaptive behavior. The ALJ based her decision, in part, on the testimony of medical expert Dr. Fuess that, "the claimant does not display the level of adaptive deficits that one would expect to find in an individual with mild mental retardation." (R. 435.) The ALJ further relied on Plaintiff's school records, social functioning, and activities of daily living and found:

> The record shows that the claimant was able to graduate high school with the assistance of learning support services with grades ranging from "B's" to "D's". Her school records show that she has good verbal and good reading comprehension skills. They also show that she has developed good social skills and that she gets along with her peers. Claimant's mental health treatment records also mention that the claimant enjoys reading and working on crossword puzzles . . .
>
> While claimant's poor work history may suggest occupational deficits in adaptive functioning, it is not known how many jobs were lost because of poor job performance. It is known that some were lost for reasons other than poor performance. In May 2010, the claimant reported that she stopped working because she was being harassed by a coworker. . . . In July 2010, the claimant reported that she had to stop working because of dizziness. . . . Some jobs may have been lost because they involved more skilled types of work. The claimant reports having to leave at least one job because she was unable to multitask. . . . Moreover, it is not known how many jobs may have been lost because of poor motivation to work. Claimant's school records show that she "works steadily <u>when interested</u>" and that she "performs well academically <u>when in school</u>" (suggesting a problem with motivation).
>
> . . .
>
> The undersigned finds that claimant's mental disorder is only mildly interfering with her activities of daily living. The record shows that

> the claimant cooks, cleans, and takes care of her daily needs. . . . Her mental health treatment records show that she always presents appropriately dressed and groomed for her therapy sessions.

(R. 436 (emphasis in original).)

On review, Judge Strawbridge concluded that substantial evidence supported the ALJ's determination that Plaintiff did not have deficits in adaptive functioning during the developmental period. Accordingly, he declined to set aside the ALJ's step three finding. Plaintiff now argues that this determination was erroneous on several grounds.

First, Plaintiff urges that the ALJ improperly equated her ability to perform activities of daily living with her ability to perform full-time competitive work. The determination of whether a claimant has deficits in adaptive behavior requires an ALJ to consult any one of four professional organizations that work with mental retardation for the measurement criteria. See Technical Revisions to Medical Criteria for Determinations of Disability, 67 FR 20018 (April 24, 2002); see also Logan v. Astrue, No. 07-1472, 2008 WL 4279820 at *8 (W.D. Pa. Sept.16, 2008). One of the authorized resources is the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed.) ("DSM-V").[2] Jones v. Colvin, No. 14-282, 2015 WL 3646313, at *5

---

[2] Although the ALJ did not explicitly state which definition of "adaptive functioning" she applied, it is abundantly obvious that she used the definition of "intellectual disability" set forth in the DSM-V. The ALJ considered factors such as activities of daily life, communication, social participation, and independent living across multiple environments such as home, school, and work.

While the ALJ should have, in the interest of thoroughness, expressly indicated the definition of "adaptive functioning" upon which she relied, Plaintiff's objections do not challenge that aspect of the ALJ's decision. Moreover, "[n]o authority exists that states that an ALJ must definitely state which definition was applied." Jones v. Colvin, No. 14-282, 2015 WL 3646313, at *8 (W.D. Pa. June 10, 2015). Rather, it is sufficient that the ALJ addressed each of the criteria used to evaluate Plaintiff's deficits. Id.; compare Harper v. Colvin, No. 13-446, 2014 WL 1278094, at *8 (W.D. Pa. Mar. 27, 2014) (declining to require an ALJ to articulate one specific standard where he "sufficiently explained the benchmark he used to arrive at his conclusion"),

7

(W.D. Pa. June 10, 2015). The DSM-V defines deficits in adaptive functioning as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-V at 37. Such deficits "limit functioning in *one or more activities of daily life*, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community." Id. at 33 (emphasis added). The requisite deficits are present when at least one of the three domains of adaptive functioning (conceptual, social, and practical) is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. See id. at 38.

Under the DSM-V's definition, the ALJ was required to consider Plaintiff's activities of daily living. The ALJ detailed her reasoning as to each category of activities and, therefore, satisfied the substantial evidence standard.[3] Accordingly, I do not agree with this portion of Plaintiff's objections.

---

with Gruden v. Astrue, No. 10-569, 2011 WL 4565502, at *5 (W.D. Pa. Sept. 29, 2011) (remanding "so the ALJ can explain what measurement method he used to determine whether plaintiff has established that she has deficits in adaptive functioning.").

[3] See, e.g., Mastarone v. Berryhill, No. 16-1421, 2018 WL 783678, at *4 (W.D. Pa. Feb. 8, 2018) (affirming ALJ's conclusion of no deficits in adaptive functioning where record showed that claimant (a) could read English with fair vocabulary and count change, even though he dropped out of school in 8th grade, (b) maintained "skilled work as a mechanic" for five years, (c) demonstrated empathy, interpersonal communication, and social skills by virtue of his relationships with his girlfriend and family; and (c) was "able to perform a full range of activities of daily living including caring for his personal needs, preparing simple meals, shopping by phone, watching television, and utilizing public transportation."); Harper v. Colvin, No. 13-446, 2014 WL 1278094 at * 8 (W.D. Pa. March 27, 2014) (affirming the ALJ's conclusion that the claimant did not have deficits in adaptive functioning where the claimant completed high school, worked in jobs requiring some skill prior to the alleged onset date, managed her own finances, drove, cared for herself, shopped for groceries, and raised two sons); Gibbs v. Comm'r. of Soc. Sec., 686 F. App'x 799, 802 (11th Cir. 2017) (holding that substantial evidence supported the ALJ's finding that the claimant did not have deficits in adaptive functioning where she lived alone at times and, with her mother's help, cared for her daughter, did her own laundry, cleaned her home, cooked

Second, Plaintiff argues that her inability to sustain employment—having held over sixty jobs between 1995 and 2009—is one of "many concrete manifestations" of her adaptive functioning deficits. (Pl.'s Objections 3.) The ALJ properly concluded that this "scattershot work history" did not conclusively establish a deficit in adaptive functioning. As detailed above, the ALJ remarked that the record contained no evidence that Plaintiff's inability to sustain a job resulted from deficits in her functioning abilities; rather she found evidence suggesting that other factors, including Plaintiff's lack of desire to work, were often responsible for her inability to maintain employment.

Finally, Plaintiff asserts that her IQ testing from December 2008 and February 2012, which showed a "mildly retarded range of intellectual functioning," reflected her adaptive functioning deficits before age 22. Courts, however, have rejected the notion that low IQ scores used to satisfy either 12.05B or 12.05C are in and of themselves sufficient to satisfy the Listing 12.05's separate requirement of "the existence of deficits in adaptive functioning prior to attaining age 22." See Gist v. Barnhart, 67 F. App'x 78, 81 (3d Cir. 2003) ("As is true in regard to any 12.05 listing, before demonstrating the specific requirements of Listing 12.05C, a claimant must show proof of a 'deficit in adaptive functioning' with an initial onset prior to age 22."); Lansdowne v. Astrue, No. 11-487, 2012 WL 4069363 (W.D. Pa. Sept. 17, 2012) ("[P]ursuant to the Regulations and case law, in order to meet Listing 12.05, a claimant must meet *both* the introductory-criteria to that listing requiring 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested [before age 22]' *and* the criteria of one of paragraphs A through D.") "A valid IQ score need not be treated as conclusive of intellectual disability where the IQ

---

simple meals, had her driver's license, handled her own money, was able to shop, and received several passing grades in special education classes in 9th and 10th grades).

score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." Jones v. Soc. Sec. Admin., Comm'r, 695 F. App'x 507, 509 (11th Cir. 2017). "In other words, evidence of a claimant's daily activities and behavior may show that the claimant has a greater degree of adaptive functioning than suggested by his IQ scores." Id.

Ultimately, Plaintiff bears the burden of proof to show that she meets or equals the listings at step three. Gist, 67 F. App'x at 81. Aside from referencing her work history, which— as noted above—is not sufficient, Plaintiff has not provided evidence establishing that before the age of 22 she had a deficit in adaptive functioning. As such, I find the ALJ's listing determination to be well supported by substantial evidence. Accordingly, I decline to remand the ALJ's Step Three finding.

**B.** **ALJ's Evaluation of Medical Professional Opinions**

Plaintiff's second objection to the R&R challenges Judge Strawbridge's adoption of the ALJ's findings with respect to the various medical opinion evidence. Specifically, Plaintiff argues that: (1) the ALJ failed to follow regulatory guidance requiring that deference be accorded to the opinion by Plaintiff's treating physician, Dr. Wright; and (2) the ALJ's weighing of the various non-treating medical opinions was in error.

1. Dr. Wright

Dr. Wright was Plaintiff's treating psychologist. On August 11, 2011, Dr. Wright completed a Mental Impairment Questionnaire and assessed Plaintiff as having limited mental abilities in several areas of functioning needed for unskilled work, such as understanding and carrying out short and simple instructions and maintaining regular attendance. Dr. Wright further remarked that Plaintiff (a) lacked an ability to compete in areas such as making simple work decisions, and working in coordination with and proximity to others, and (b) had no "useful" ability to sustain an ordinary routine without special supervision, complete a normal workday or

workweek without interruption from her psychological symptoms, or perform at a consistent pace. (R. 424.) Dr. Wright determined that Plaintiff had only a mild restriction on activities of daily living, and limited episodes of decompensation, but moderate to marked limitations in social functioning, and marked to extreme limitations on concentration, persistence and pace. (R. 426.)[4]

The ALJ addressed Dr. Wright's opinion as follows:

> The undersigned finds that claimant's mental disorder is no more than moderately interfering with her ability to maintain concentration, persistence or pace. When evaluated by Dr. Bonnie Wright in August 2012, the claimant was considered to have limited but satisfactory ability to understand, remember and carry out very short and simple instructions. . . . When seen in therapy on November 18, 2014, the claimant was described as cooperative and attentive. When more recently seen on May 5, 2015, the claimant was described as alert, well-focused and cooperative.
> . . .
> The undersigned is also crediting Dr. Bonnie Wright's opinion that the claimant has limited but satisfactory ability to: understand, remember and carry out very short and simple instructions; to maintain regular job attendance; to interact appropriately with the general public; and to maintain social appropriate behavior. . . . The undersigned is giving little weight to the more restrictive limitations noted by Dr. Wright because they are based in large part upon a finding of mild mental retardation that is not well-supported in the record.

(R. 437.) Judge Strawbridge found this assessment of Dr. Wright's opinion to be supported by substantial evidence.

Plaintiff's current objections reiterate her challenges to the ALJ's weighing of Dr. Wright's testimony and allege that neither the ALJ nor Judge Strawbridge properly evaluated Dr. Wright's opinion under the regulatory factors.

I disagree with Plaintiff for several reasons. Primarily, as noted by Judge Strawbridge, it is well established that although "treating physicians' opinions are assumed to be more valuable

---

[4] Dr. Wright's report is more thoroughly described in the R&R.

than those of non-treating physicians," this "assumption does not turn on impermissibly mechanical deference to the treating physician's opinion." Cyprus Cumberland Res. v. Dir., Office of Workers' Compensation Programs, 170 F. App'x 787, 792 (3d Cir. 2006) (quotations omitted). An ALJ's decision to reject the opinion of a treating physician is proper where the physician's own treatment records do not support his/her opinion and the record contains medical evidence contrary to his/her opinion. See Grogan v. Comm'r of Soc. Sec., 459 F. App'x 132, 137 (3d Cir. 2012); see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The ALJ need not accept an opinion of a physician—even a treating physician—if it is conclusory and brief and is unsupported by clinical findings.").

Here, as noted in the R&R, substantial evidence undermined the notion that Plaintiff was as limited as Dr. Wright suggested: psychotherapy notes contemporaneous to the medication management that Dr. Wright oversaw were benign; Plaintiff was discharged from psychotherapy because she had achieved all of her therapy goals; there was no record of mental health treatment after Dr. Wright offered her opinion until, due to developments in her disability claim, Plaintiff sought out treatment with a new provider in March 2014; and contrary to Dr. Wright's opinion, Plaintiff's activities of daily living showed that she was not as limited as described. (R&R 22.)

Further, Dr. Wright's opinion was encompassed entirely in a checkbox report with no written explanation for the limitations she imposed. As the Third Circuit has observed, "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank"—as is the case here—"are weak evidence at best." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993). This is particularly true when those residual capacity reports are "unaccompanied by thorough written reports." Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986); see also Santiago v. Astrue, No. 11–3650, 2012 WL 1080181, at *9 (E.D. Pa. Mar. 28, 2012) ("[I]n light of the relatively cursory

and checklist format of [the treating physician's] opinion, the sparsity of the support for her conclusions in her own records, and the contradictory nature of the medical evidence from [the plaintiff's] treating therapist, the Court holds that the ALJ was not required to attribute more than 'little to no weight' to [the treating physician's] opinion of [the plaintiff's] mental limitations.").

Finally, it is notable that the ALJ did not completely reject Dr. Wright's opinion, but rather found that it was entitled to limited weight to the extent it was supported by other evidence of record. Indeed, the ALJ incorporated many of Dr. Wright's opinions into the residual functional capacity assessment and found that Plaintiff was capable of performing simple, routine job tasks with few changes in the work routine, and that the work should be self-paced, not involve detailed instructions, not require more than occasional interaction with coworkers or the general public, and not involve occupational hazards. (R. 437.)

Under controlling jurisprudence, the ALJ was not required to blindly accept Dr. Wright's opinion without consideration of the entire record. As I agree with Judge Strawbridge that the ALJ's decision to reject a portion of Dr. Wright's assessment was supported by substantial evidence, I will overrule Plaintiff's objection on this issue.

2. Drs. Knight, Hamme, Fuess, and McGalliard

Plaintiff's final objection concerns the ALJ's weighing of the other non-treating, medical opinions of record. The ALJ was presented with opinion testimony from four psychologists regarding her ability to meet or equal a listing: Drs. Knight and Hamme, who examined Plaintiff; Dr. Fuess, who reviewed Plaintiff's medical records and testified at the administrative hearing;

and Dr. McGalliard, who provided a post-hearing record review and assessment of Plaintiff's impairments.

Dr. Knight examined Plaintiff on December 1, 2008, at the request of the state agency when it was adjudicating her first disability application. Dr. Knight conducted a clinical interview and administered the WAIS-III test,[5] which indicated that Plaintiff had a full scale IQ of 61, on the retarded range. (R. 288.) Dr. Knight believed the scores to be valid and reliable and opined that Plaintiff was a,

> [M]entally retarded 29-year-old female with limited educational skills. She has difficulty following directions and has been unable to keep a job. She was able to carry out some short and simple instructions and remember details. She was unable to understand or carry out detailed instructions. The applicant lacks ability to make judgment on simple work-related decisions.

(R. 289.) Dr. Knight recommended a vocational training program on Plaintiff's level of competency. (R. 290.)

Dr. Hamme evaluated Plaintiff on February 9, 2012, and also administered the WAIS-III test. The testing suggested that Plaintiff's full scale IQ was 66, which put Plaintiff at the mildly retarded to borderline level of intellectual functioning. (R. 407). Dr. Hamme remarked that the results suggested a pervasive intellectual deficiency and were consistent with the work difficulties Plaintiff had experienced. (R. 408.) The doctor also commented that Plaintiff's approach to the testing "was cooperative but not especially energetic or interested. Her effort appeared to be minimal, particularly as the questions increased in difficulty." (R. 407.)

---

[5] The Wechsler Adult Intelligence Scales test ("WAIS-III") is "the standard instrument in the United States for assessing intellectual functioning." Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002).

14

Dr. Fuess testified at the administrative hearing—after a comprehensive review of Plaintiff's school and medical records—and remarked that the 2008 and 2012 test scores were not consistent with Plaintiff's history and her educational performance. (R. 457.) He noted that she received B's, C's, and D's in high school, with learning support services, and that her Wide Range Achievement Test ("WRAT") scores administered in school were inconsistent with the mild mental retardation suggested by Drs. Knight and Hamme. (R. 458.) He further commented that the IQ tests administered by Drs. Knight and Hamme were highly subjective, in that they depended significantly on the effort put forth in the testing. (R. 459.) Extrapolating Plaintiff's IQ from her WRAT scores, Dr. Fuess opined that Plaintiff's IQ would be in the low average range. (R. 460.)

Finally, after the December 8, 2015 administrative hearing, Plaintiff's counsel supplemented the record with an opinion by David McGalliard, Ph.D., who reviewed the record. Dr. McGalliard rejected Dr. Fuess's assessment and opined that it was "specious to claim that an old level of achievement measured by the WRAT scores invalidates a more recent measure of intellectual ability as there are a host of factors in the intervening time period that could impact intellectual ability, for example, head trauma, or impoverished environment." (R. 809.) He observed that the supportive special education environment that Plaintiff had in school was missing for many years at the time of the administration of the 2008 and 2012 WAIS tests. He concluded that "to say that the WAIS data showing intellectual disability are invalid because of very old WRAT achievement scores administered when she was in a special education learning support environment is absurd. Without specialized learning support, her cognitive capabilities have declined." (R. 809.)

The ALJ explicitly considered the testimony of all four doctors and opted to give significant weight to the hearing testimony of Dr. Fuess, noting:

15

> The record shows that the claimant received a Full Scale IQ score of 61 when tested on the WAIS-III in December 2008. . . ., and that she later received a Full Scale IQ score that was estimated to be between 63 and 71 when tested in February 2012 . . . . The latter IQ score would place the claimant within the borderline to mildly deficient range of intellectual ability. Although the examining psychologists considered these scores to be a valid indicator of the claimant's intellectual ability, the validity of these scores was questioned by Dr. Fuess, a licensed psychologist who testified as an impartial medical expert at the December 2015 hearing.
>
> Dr. Fuess testified that claimant's 2008 and 2012 Full Scale IQ scores were inconsistent with the scores the claimant achieved during a 1996 administration of the Wide Range Achievement Test. He noted that while the claimant achieved a borderline score of 74 on the math achievement test, she earned average scores on both the spelling and reading achievement tests. In his opinion, her combined scores on the achievement tests suggest that the claimant is functioning within the low average range of intellectual ability with an estimated Full Scale IQ somewhere in the 80s range. Dr. Fuess also testified that the more recent IQ scores achieved by the claimant on the 2012 test were also questionable because the examining psychologist had noted that the claimant displayed minimal effort during the testing. Dr. Fuess further testified that based on his review of the record as a whole, the claimant does not display the level of adaptive deficits that one would expect to find in an individual with mild mental retardation.

(R. 435.) The ALJ noted that Dr. Fuess's opinion was persuasive "in part, because it was based on consideration of the record evidence as a whole, to include, *inter alia*, evidence of claimant's social functioning, activities of daily living, and the entirety of claimant's school records." (R. 435 n.1.)

On review, Judge Strawbridge affirmed the ALJ's decision to credit Dr. Fuess over the other medical professionals. He noted that Dr. Knight's consultative examination was undertaken on December 1, 2008, some ten months prior to the alleged onset date of October 25, 2009. (R&R 26.) Judge Strawbridge also posited that Dr. Hamme did not complete a statement reflecting her

16

opinion of Plaintiff's residual functional capacity and that nothing in her evaluation report appeared to be in conflict with the ALJ's RFC finding.[6] (Id.)

Plaintiff now contends that that the ALJ erred in giving more weight to Dr. Fuess's opinion because it stood alone and was inconsistent with the remainder of the record, including the opinions of Drs. Hamme, Knight, and McGalliard.

While I recognize that reasonable jurists could have weighed the evidence differently, I concur with Judge Strawbridge that the ALJ's decision is supported by substantial evidence. A medical opinion is simply "one piece of evidence to evaluate in formulating the RFC . . . (and) it is not necessarily controlling." Pollace v. Astrue, No. 06–5156, 2008 WL 370590, at *5 (E.D. Pa. Feb. 6, 2008). In evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another. Diaz v. Commissioner of Social Sec., 577 F.3d 500, 505 (3d Cir. 2009). "When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason. The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (internal citation omitted).

Here, the ALJ set forth an adequate basis for accepting Dr. Fuess's opinion and rejecting those of Drs. Hamme, Knight, and McGalliard. First, the ALJ noted that Dr. Fuess provided a contemporaneous assessment of Plaintiff's functioning based on a longitudinal review of Plaintiff's school and mental health records through 2015. This review stood in contrast to that of Dr. Knight, who tested Plaintiff in 2008, prior to the disability onset date, and had no long-term picture of Plaintiff's functioning over the next seven years. Similarly, Dr. Hamme evaluated

---

[6] The R&R did not address the ALJ's rejection of Dr. McGalliard's report.

Plaintiff only one time in 2012, three years before the hearing, and, unlike Dr. Fuess, did not have the benefit of reviewing Plaintiff's subsequent psychological records.

Second, the ALJ credited Dr. Fuess's explanation that the earlier Wide Range Achievement Test scores conducted while Plaintiff was in school were a more reliable indicator of Plaintiff's adaptive functioning than the Full Score IQ scores on which Drs. Knight and Hamme premised their assessments. The ALJ found that Dr. Fuess credibly testified that Full Scale IQ tests can be manipulated and results are dependent on the effort put forth by the test subject—an observation corroborated by Dr. Hamme who remarked that Plaintiff displayed minimal effort in her testing.

Third, the ALJ remarked that, unlike Drs. Knight and Hamme, Dr. Fuess did not rest his opinion on only clinical testing results, but also on his ability to review whether that testing was consistent with Plaintiff's activities of daily living and general functioning. Indeed, as noted by the ALJ, Dr. Fuess was able to opine that, "based on his review of the record as a whole, Plaintiff did not display the level of adaptive deficits that one would expect to find in an individual with mild mental retardation." (R. 435.)

Finally, the mere fact that Dr. McGalliard's opinion contradicted that of Dr. Fuess does not render the ALJ's decision reversible, as the ALJ explained her basis for discounting Dr. McGalliard. She observed that Dr. McGalliard's main criticism was that Dr. Fuess's opinion was based solely on the previous WRAT (school achievement) scores. The ALJ found this criticism faulty and deemed Dr. Fuess's opinion persuasive precisely "because it was based on consideration of the record evidence as a whole, to include, *inter alia*, evidence of claimant's social functioning, activities of daily living, and the entirety of claimant's school records. (R. 435 n.1.) Moreover, the ALJ's own independent review of the record suggested that Dr. Fuess's assessment was "more consistent with the evidence of record when considered in its entirety." (R. 436.)

18

Ultimately, the ALJ's listings analysis and RFC assessment were consistent with and supported by substantial evidence of record. While reasonable minds may have drawn different conclusions, it is not within my purview to re-weigh the evidence of record under a *de novo* analysis. I concur with Judge Strawbridge that the ALJ's decision to credit Dr. Fuess above the other psychologists satisfied the substantial evidence standard of review.

## IV. CONCLUSION

For all of the foregoing reasons, I will overrule Plaintiff's Objections and adopt the Report and Recommendation in its entirety. An appropriate Order follows.